GREAT WEST CASUALTY COMPANY )
and MIDWEST TRANSPORT, INC. )
                          )
    Plaintiffs, )
                          )    Civil No. 16-382
        vs. )    Chief Magistrate Judge Maureen P. Kelly
                          )
                          )
SELECTIVE INSURANCE COMPANY )
OF AMERICA, )    Re: ECF Nos. 33 and 37
                          )
    Defendant. )

## OPINION

**KELLY, Chief Magistrate Judge**

Pending before the Court are the cross-motions for summary judgment filed by Plaintiffs Great West Casualty Company ("Great West Casualty") and Midwest Transport, Inc. ("Midwest") ("Plaintiffs"), ECF No. 33, and Defendant Selective Insurance Company of America ("Selective"), ECF No. 37, in this action for declaratory judgment, breach of contract and equitable contribution.

By this action Plaintiffs seek a declaration that Selective owes Midwest insurance coverage under Selective Commercial Auto Policy Number S 210012100 ("the Selective Policy") with respect to the lawsuit captained *Cynthia L. Rice, Administratrix of the Estate of Scott B. Rice, Deceased; and Cynthia L. Rice, Individually v. Cargo Force, Inc. et al.*, pending in the Court of Common Pleas of Allegheny County, Pennsylvania at Docket No. GD-15-18582 ("the Underlying Action") in which Cynthia Rice, as Administratrix of the Estate of her husband,

Scott B. Rice, and individually, sued Cargo Force, Inc. ("Cargo Force"), Veltri Trucking, Inc. ("Veltri Trucking"), Reggie Sell, Jr. ("Sell"), and Midwest.

At issue in the cross-motions for summary judgment is whether, pursuant to the Selective Policy, Selective has a duty to defend and indemnify Midwest in the Underlying Action, whether Selective breached the Selective Policy as to Midwest when it refused to defend and indemnify Midwest with respect to the Underlying Action, and whether Selective owes Great West Casualty equitable contribution for the defense costs that Great West Casualty has incurred in defending Midwest in the Underlying Action to date. In support of their motion for summary judgment, Plaintiffs contend that Midwest is an insured under the Selective Policy and the complaint in the Underlying Action alleges claims that fall within the Selective Policy's coverage and, therefore, Selective is obligated to defend and indemnify Midwest with respect to the Underlying Action. ECF No. 36 at 11-12 and 14. In opposition to Plaintiffs' motion for summary judgment, Selective contends that Midwest is not an insured under the Selective Policy and therefore, Plaintiffs' motion must be denied. ECF No. 46 at 4.

Selective contends, in support of its motion for summary judgment, that it is entitled to judgment as a matter of law because Midwest is not an insured under the Selective Policy and the claim for which Midwest seeks coverage is not covered under the Selective Policy and, therefore, Selective has no duty to defend or indemnify Midwest against claims asserted in the Underlying Action. ECF No. 39 at 1. In opposition to Selective's motion for summary judgment, Plaintiffs contend that Midwest is an insured under the Selective Policy and the claims against Midwest in the Underlying Action are covered under the Policy. ECF No. 43 at 1.

For the following reasons, the Court concludes that Selective has a duty to defend Midwest under the terms of the Selective Policy, Selective breached its contract with Midwest

2

when it failed to defend Midwest under the terms of the Selective Policy, and Great West Casualty is entitled to equitable contribution from Selective. The Court further finds it is premature to rule on Selective's duty to indemnify Midwest and that it will revisit the issue at a later date if Midwest is found liable for damages in the Underlying Action. Therefore, Plaintiffs' motion for summary judgment, ECF No. 33, is granted in part and denied in part without prejudice, and Defendant's motion for summary judgment, ECF No. 37, is denied.

## I. STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The parties must support their respective positions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A). In other words, summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). "When confronted with cross-motions for summary judgment, the "court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." Anderson v. Franklin Institute, 185 F. Supp. 3d 628, 635 (E.D. Pa. 2016) (quoting Schlegel v. Life Ins. Co. of N. America, 269 F. Supp. 2d 612, 615 n.1 (E.D. Pa. 2003) (quoting Charles A. Wright, Arthur R. Miller et al., 10A Fed. Prac. and Proc. § 2720 (3d ed. 1998)) (internal quotations omitted).

3

In reviewing the evidence, the court draws all reasonable inferences in favor of the nonmoving party. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986); Huston v. Procter & Gamble Paper Prod. Corp., 568 F.3d 100, 104 (3d Cir. 2009) (citations omitted). It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. See Anderson, 477 U.S. at 255; Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004); Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 247-48. An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with regard to that issue. See id. "Where the record taken as a whole could not lead a reasonable trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587; Huston, 568 F.3d at 104.

## II. RELEVANT FACTS

The Court will now review the facts relevant to the pending cross-motions for summary judgment. If the parties agree on a fact, the Court will cite to the relevant page and paragraph in the parties' joint statement of undisputed facts pursuant to L.Civ.R. 56. If a party disputes a fact alleged by the other party, the Court will cite to the specific evidence of record that supports the fact in question.

### A. Federal Action

Plaintiffs seek a declaration that Selective owes Midwest insurance coverage under the Selective Policy with respect to the Underlying Action. ECF No. 34, ¶ 2. The Underlying Action was initiated by Mrs. Rice, as Administratrix of the Estate of her husband, Scott Rice, and

4

in her individual capacity, against Cargo Force, Veltri Trucking, Sell, and Midwest. Id., ¶ 3. In her Amended Complaint in the Underlying Action ("the Amended Complaint"), Mrs. Rice alleges that on September 8, 2014, her husband, Scott Rice, was killed, and she was injured when the rear dually wheels of a trailer owned by Midwest ("the Midwest Trailer"), and being hauled by a 2004 Mack truck, Vehicle Model CX613 ("the Veltri Tractor"), owned by Veltri Trucking, and driven by Sell, detached from the Midwest Trailer, traveled across a grassy median on Interstate 79 and impacted a 2011 Volkswagen Tiguan being operated by Scott Rice with Mrs. Rice as a passenger ("the Rice vehicle"). Id., ¶¶ 4, 6-7, 10, 39. At all relevant times, including at the time of the detachment of the rear-dually wheels from the Midwest Trailer, Sell was employed by Veltri Trucking as a commercial truck driver and was acting in the course and scope of his employment. Id., ¶ 6.

Midwest had a contract with the United States Postal Service ("USPS") to transport mail and a schedule under which it performed its contract-related services. Id., ¶ 13. Veltri Trucking had a separate contract with the USPS to transport mail and a schedule under which it performed its contractual services. Id., ¶ 14. There was no contract between Midwest and Veltri Trucking. Id., ¶ 18.

On September 8, 2014, prior to the accident involving the Rice vehicle, Sell had driven the Veltri Tractor to a truck terminal located in Moon Township, Pennsylvania, operated by Cargo Force. Id., ¶ 15. At the truck terminal, Cargo Force dispatched the Midwest Trailer, which was empty, to Sell for transport to a USPS facility located in Pittsburgh. Id., ¶ 16. While Sell was operating the Veltri Tractor and hauling the Midwest Trailer from Cargo Force's facility to the USPS facility in Pittsburgh, the Midwest Trailer's rear dually wheels detached and struck the Rice vehicle. Id., ¶ 17.

5

Selective insured Veltri Trucking pursuant to the Selective Policy, with effective dates of January 22, 2014 to January 22, 2015. Id., ¶ 19. Great West Casualty insured Midwest pursuant to Commercial Lines Policy Number GWP88246D ("the Great West Policy"), with effective dates of August 1, 2014 to August 1, 2015. Id., ¶ 20.

## B. State Court – Underlying Action

Relevant to the instant federal action, Cynthia Rice alleges in the Amended Complaint in the Underlying Action as follows. On September 8, 2014, at approximately 6:00 a.m., Scott Rice, was operating the Rice vehicle in the left lane of travel on south-bound Interstate 79. Id., ¶ 24. Mrs. Rice, his wife, was a front seat passenger of the Rice vehicle. Id., ¶ 25. Sell was operating a tractor trailer unit on north-bound Interstate 79, travelling in a northerly direction, at the same time that Scott Rice was operating the Rice vehicle, travelling in a south-bound direction. Id., ¶ 27. The tractor-trailer unit operated by Sell was a commercial vehicle in interstate commerce governed by the Federal Motor Carrier Safety Regulations ("FMCSR"), 49 C.F.R. §350.1 et seq. and §390.1 et seq., and operated under the authority of the Federal Motor Carrier Safety Administration. Id., ¶ 28. While Sell was operating the tractor-trailer unit on north-bound Interstate 79 in close proximity to Exit 68, the rear dually wheels of the Midwest Trailer detached, traveled across a grassy median, entered the southbound lanes of travel and impacted the Rice vehicle operated by Scott Rice. Id., ¶ 29. Scott Rice sustained fatal injuries and Cynthia Rice sustained severe and permanent personal injuries when the Midwest Trailer's rear dually wheels struck the Rice vehicle. Id., ¶ 30. Mrs. Rice also sustained emotional injuries as a result of witnessing her husband's death. Id., ¶ 31. These injuries were caused, in part, "[a]s a direct and proximate result of the negligence, carelessness, recklessness and wantonness" of the various defendants, including Midwest. Id., ¶ 32.

6

In the Amended Complaint, the plaintiffs further alleged the following regarding the maintenance of the Midwest Trailer. The Midwest Trailer was not sufficiently, adequately, or properly maintained, such that it had problems with its axle, spindle assembly, lock nuts, wheel bearings, and rear dually-wheels prior to the incident in which the rear dually-wheels of the Midwest Trailer detached and struck the Rice vehicle. Id., ¶ 33. The Midwest Trailer was unsafe for road use, and it created an unreasonable hazard to other motorists. Id., ¶ 34.

The plaintiffs in the Underlying Action also alleged that Midwest was aware of these issues with the Midwest Trailer prior to the subject motor vehicle accident, and the Midwest Trailer was taken out of service by Midwest, but Cargo Force improperly placed the Midwest Trailer back into service prior to the subject motor vehicle accident. Id., ¶¶ 35-36.

In addition, the plaintiffs alleged that before starting his route on September 8, 2014, Sell failed to perform a proper pre-trip inspection of the Midwest Trailer, and instead, coupled the Midwest Trailer to the Veltri Tractor while at the Cargo Force facility, and thereafter began to operate the tractor-trailer unit, leaving the Cargo Force facility and driving on north-bound Interstate 79. Id., ¶¶ 37-38.

With respect to Midwest, the plaintiffs also alleged in the Amended Complaint that:

24. At all times material hereto, it is believed and therefore averred that the trailer-unit operated by Defendant, REGGIE SELL, JR., was owned and/or controlled by Defendants, MIDWEST TRANSPORT, INC. and/or CARGO FORCE, INC. t/d/b/a CARGO FORCE INC.

25. At all times material hereto, it is believed and therefore averred that the aforementioned trailer unit was not sufficiently, adequately, and/or properly maintained in accordance with the requirements set forth in the FMCSR [Federal Motor Carrier Safety Regulations] and/or general industry standards and had, in fact, been placed out-of-service with a "red tag" affixed thereto due to mechanical problems with its axle, spindle assembly, lock nuts, wheel bearings, rear dually-wheels, and/or other components.

7

26. At all times material hereto, it is believed and therefore averred that the aforementioned trailer unit existed in an unsafe and out-of-service condition, and created an unreasonable hazard to other motorists on the roadway.

27. At all times material hereto, and prior to being operated by Defendant, REGGIE SELL, JR., on September 8, 2014, it is believed and therefore averred that the aforementioned trailer unit had been observed by Defendants, CARGO FORCE, INC. t/d/b/a CARGO FORCE INC. t/d/b/a CARGO FORCE and MIDWEST TRANSPORT, INC., to be emitting large quantities of odorous smoke from an area in close proximity to the rear dually-wheels of the trailer while within a facility owned, operated, and/or managed by Defendant, CARGO FORCE, INC. t/d/b/a CARGO FORCE INC. t/d/b/a CARGO FORCE, located at 700 Airside Drive, Moon Township, Allegheny County, Pennsylvania 15108.

28. At all times material hereto, it is believed and therefore averred that Defendants, CARGO FORCE, INC. t/d/b/a CARGO FORCE INC. t/d/b/a CARGO FORCE and/or MIDWEST TRANSPORT, INC., thereafter affixed a "red tag" to the aforementioned trailer unit and had placed it out-of-service and/or otherwise marked it to not be operated.

29. Thereafter, it is believed and therefore averred that Defendant, CARGO FORCE, INC. t/d/b/a CARGO FORCE INC. t/d/b/a CARGO FORCE, cut and/or otherwise removed part of the aforementioned "red tag" that was placed on the trailer unit, and attempted multiple times to dispatch the trailer onto the roadway without having the aforementioned trailer unit properly inspected and/or repaired with knowledge of its dangerous and hazardous condition.

. . .

41. As a direct and proximate result of the negligence and carelessness of Defendant, MIDWEST TRANSPORT, INC., as more fully set forth in Counts XIII and XIV, below, Plaintiff's Decedent, SCOTT B. RICE, sustained severe and fatal personal injuries, as described in more detail in Counts XIII and XIV, below.

42. As a direct and proximate result of the negligence, carelessness, recklessness, and wantonness of Defendant, MIDWEST TRANSPORT, INC., as more fully set forth in Counts XV and XVI, below, Plaintiff, CYNTHIA L. RICE, sustained severe and permanent personal injuries, as described in more detail in Counts XV and XVI, below.

ECF No. 34-2 at 20-22, 24.

In Count XIII of the Amended Complaint in the Underlying Action, the plaintiffs set

forth a survival claim against Midwest by Mrs. Rice as the Administratrix of Mr. Rice's Estate.

8

Id. at 87-94. In Count XIV of the Amended Complaint, the plaintiffs set forth a wrongful death claim against Midwest by Mrs. Rice as the Administratrix of Mr. Rice's Estate. Id. at 94-101. In Count XV of the Amended Complaint, the plaintiffs set forth a negligence/intentional tort claim against Midwest by Mrs. Rice individually. Id. at 101-107. In Count XVI of the Amended Complaint, the plaintiffs set forth a negligent infliction of emotional distress claim against Midwest by Mrs. Rice individually. Id. at 107-108.

## C. Selective Policy

The Selective Policy provides up to $1,000,000 in Business Automobile coverage per accident. ECF No. 34, ¶ 43. The insuring agreement of the Selective Policy states as follows:

> We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto".
>
> We will also pay all sums an "insured" legally must pay as a "covered pollution cost or expense" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of covered "autos". However, we will only pay for the "covered pollution cost or expense" if there is either "bodily injury" or "property damage" to which this insurance applies that is caused by the same "accident".
>
> We have the right and duty to defend any "insured" against a "suit" asking for such damages or a "covered pollution cost or expense". However, we have no duty to defend any "insured" against a "suit" seeking damages for "bodily injury" or "property damage" or a "covered pollution cost or expense" to which this insurance does not apply. We may investigate and settle any claim or "suit" as we consider appropriate. Our duty to defend or settle ends when the Liability Coverage Limit of Insurance has been exhausted by payment of judgments or settlements.

Id., ¶ 44. The Selective Policy provides liability coverage for those "covered autos" designated as Symbol 7 automobiles. Id., ¶ 45. A Symbol 7 automobile is defined by the Business Auto Coverage Form of the Selective Policy to include "Specifically Described 'Autos'"— that is, "Only those 'autos' described in Item Three of the Declarations for which a premium charge is

9

shown (and for Liability Coverage any 'trailers' you don't own while attached to any power unit described in Item Three)." Id., ¶ 46. The Business Auto Coverage Form of the Selective Policy is modified by the "Truckers Endorsement," Endorsement Number CA 23 20 03 06 ("the Truckers Endorsement"), in relevant part, as follows:

> For any operations you engage in as a "trucker" the policy is changed as follows:
>
> **A. Who Is An Insured** under Liability Coverage is replaced by the following:
>
> 1. Who Is An Insured
>
> a. You for any covered "auto.
>
> b. Anyone else while using with your permission a covered "auto" you own, hire or borrow except: . . .
>
> c. The owner or anyone else from whom you hire or borrow a covered "auto" that is a "trailer" while the "trailer" is [connected] to another covered "auto" that is a power unit, or, if not connected:
>
> (1) Is being used exclusively in your business as a "trucker"; and
> (2) Is being used pursuant to operating rights granted to you by a public authority.

Id., ¶ 47. The Truckers Endorsement further provides the following definitions:

> E. Additional Definitions
>
> As used in this endorsement:
>
> 1. "Trailer" includes a semitrailer or a dolly used to convert a semitrailer into a trailer. But for Trailer Interchange Coverage only, "trailer" also includes a container.
>
> . . .
>
> 3. "Trucker" means any person or organization engaged in the business of transporting property by "auto" for hire.

Id., ¶ 48.

The Veltri Tractor is a "covered auto" under the Selective Policy. Id., ¶ 49. Sell was a

"trucker" as defined by the Selective Policy at the time of the subject motor vehicle accident. Id.,

¶ 50.

The Selective Policy also includes the "Endorsement of Motor Carrier Policies of

Insurance for Public Liability Under Sections 29 and 30 of the Motor Carrier Act of 1980," Form

MCS-90. Id.,¶ 51. Pursuant to this Endorsement:

> In consideration of the premium stated in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the Insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere. Such insurance as is afforded, for public liability, does not apply to injury to or death of the insured's employees while engaged in the course of their employment, or property transported by the insured, designated as cargo.

Id. The Form MCS-90 provides that the insurance provided in the Selective Policy is primary

insurance. Id., ¶ 52.

The Selective Policy also includes the "Endorsement for Motor Carrier Policies of

Insurance for Automobile Bodily Injury and Property Damage Liability Under Section 10927,

Title 49 of the United States Code," Form BMC 90, which states as follows:

> In consideration of the premium stated in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the Insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere. Such insurance as is afforded, for public liability, does not apply to

11

injury to or death of the insured's employees while engaged in the course of their employment, or property transported by the insured, designated as cargo.

Id., ¶ 53.

The Business Auto Coverage Form of the Selective Policy contains an Other Insurance Provision. This provision states, in pertinent part, as follows:

### 5. Other Insurance

a. For any covered "auto" you own, this Coverage Form provides primary insurance. For any covered "auto" you don't own, the insurance provided by this Coverage Form is excess over any other collectible insurance. However, while a covered "auto" which is a "trailer" is connected to another vehicle, the Liability Coverage this Coverage Form provides for the trailer is:

(1) Excess while connected to a motor vehicle you do not own.

(2) Primary while it is connected to a covered "auto" you own.

. . .

d. When this Coverage Form and any other Coverage Form or policy covers on the same basis, either excess or primary, we will pay only our share. Our share is the proportion that the Limit of Insurance of our Coverage Forms bears to the total of the limits of all the Coverage Forms and policies covering on the same basis.

Id., ¶ 54. The Great West Policy also has an Other Insurance Provision. Id.

Midwest requested coverage from Selective under the Selective Policy with respect to the Underlying Action on November 16, 2015, December 21, 2015, and March 14, 2016. Id., ¶¶ 58-60, 62. On March 15, 2016, Selective disclaimed coverage for Midwest in connection with the Underlying Action. Id., ¶ 63. Great West Casualty is defending Midwest in the Underlying Action under a reservation of rights. Id., ¶ 64.

## III. APPLICABLE LAW

### A. Choice of Law

The Court begins its legal analysis in this action based upon diversity jurisdiction with a

choice of law determination. As explained by the district court in <u>Castlepoint Nat. Ins. Co. v.</u>

<u>Ins. Co. of Penn.</u>, No. 1:14-0792, 2015 WL 2339092 (M.D. Pa. May 13, 2015):

> In cases such as this one where the federal court's jurisdiction lies in diversity, the
> court will procedurally apply the choice of law princip[les] of the forum state.
> <u>Hammersmith v. TIG Ins. Co.</u>, 480 F.3d 220, 226 (3d Cir. 2007).
>
> . . .
>
> Pennsylvania applies a flexible, interest/contacts methodology under the
> Restatement (Second) Conflict of Laws, to contract choice of law questions,
> "bearing in mind that 'we are concerned with the contract of insurance' and not
> the underlying tort." <u>Hammersmith</u>, 480 F.3d at 232–33. Pennsylvania applies
> Section 193 of the Restatement (Second) of Conflict of Laws when the insured
> has a principal place of insured risk, stating "the rights created thereby are
> determined by the local law of the state which the parties understood was to be
> the principal location of the insured risk during the term of the policy ...."
> <u>Specialty Surfaces Int. Inc. v. Continental Cas. Co.</u>, 609 F.3d 223, 233 (3d Cir.
> 2010). When the insured has no principal place of risk, Pennsylvania courts apply
> Section 188(2) of the Restatement (Second) of Conflict of Laws, to determine
> which state has greater contacts with the contract at issue. <u>Id.</u> The factors include
> the place of contracting and negotiating, the place of performance, and the place
> of the subject matter of the contract. <u>Id.</u>

<u>Id.</u>, at *3.

Applying the choice of law principles of Pennsylvania, the forum state, to the facts

underlying this action, the named insured in the Selective Policy is Veltri Trucking. According

to the Amended Complaint in the Underlying Action, which the parties do not dispute, Veltri

Trucking is a Pennsylvania corporation with a principal place of business in Pennsylvania and an

office/usual place of business in Pennsylvania. ECF No. 34-2 at 18. Selective contends, and

Plaintiffs do not dispute, that "[t]he Selective Policy was issued to Veltri Trucking in

Pennsylvania and insures Veltri Trucking's operations in Pennsylvania." ECF No. 39 at 6 n.1.

The Court finds, as both parties agree, that Pennsylvania law governs the interpretation of the Selective Policy and the issues of whether pursuant to the Selective Policy, Selective has a duty to defend and indemnify Midwest in the Underlying Action, Selective breached a contract with Midwest when it failed to defend Midwest in the Underlying Action, and Great West Casualty is entitled to equitable contribution based on Selective's failure to defend Midwest in the Underlying Action.

## B. Pennsylvania Law

Having determined that Pennsylvania law is applicable to this litigation, "this case involves a dispute regarding insurance coverage. In actions arising under an insurance policy, [Pennsylvania] courts have established a general rule that it is a necessary prerequisite for the insured to establish that his claim falls within the coverage provided by the insurance policy." Erie Ins. Grp. v. Catania, 95 A.3d 320, 322 (Pa. Super. Ct. 2014) (citing McEwing v. Lititz Mut. Ins. Co., 77 A.3d 639, 646 (Pa. Super. Ct. 2013) (citations omitted)). In Amer. Auto. Ins. Co. v. Murray, 658 F.3d 311 (3d Cir. 2011), the United States Court of Appeals for the Third Circuit established the approach that Pennsylvania district courts should take when reviewing insurance-contract provisions such as those contained in the Selective Policy:

It is the function of the court to interpret insurance contracts under Pennsylvania law. *Melrose Hotel Co. v. St. Paul Fire & Marine Ins. Co.*, 432 F. Supp. 2d 488, 495 (E.D. Pa. 2006) (citing *401 Fourth St., Inc. v. Investors Ins. Grp.*, 879 A.2d 166, 171 (Pa. 2005)). The court's primary consideration in performing this function is "'to ascertain the intent of the parties as manifested by the language of the written instrument.'" *Home Ins. Co. v. Law Offices of Jonathan DeYoung, P.C.*, 32 F. Supp. 2d 219, 223 (E.D. Pa. 1998) (quoting *Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 469 A.2d 563, 566 (Pa. 1983)). The policy must be read as a whole and construed in accordance with the plain meaning of terms. *C.H. Heist Caribe Corp. v. Am. House Assurance Co.*, 640 F.2d 479, 481 (3d Cir. 1981). Words of common usage must be "construed in their natural, plain, and ordinary sense, with a court free to consult a dictionary to inform its understanding of terms." *Melrose Hotel Co.*, 423 F. Supp. 2d at 495 (citing *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 108 (Pa. 1999)).

14

Where the language of an insurance policy is clear and unambiguous, a court must enforce that language. *Med. Protective Co. v. Watkins*, 198 F.3d 100, 103 (3d Cir. 1999). "Furthermore, if possible, 'a court should interpret the policy so as to avoid ambiguities and give effect to all of its provisions.'" *Id.* (quoting *Little v. MGIC Indem. Corp.*, 836 F.2d 789, 793 (3d Cir. 1987)). However, if the contract's terms are reasonably susceptible to more than one interpretation, then they must be regarded as ambiguous. *Id.*; *C.H. Heist Caribe Corp.*, 640 F.2d at 481. "'Ambiguous provisions in an insurance policy must be construed against the insurer and in favor of the insured; any reasonable interpretation offered by the insured, therefore, must control.'" *Med. Protective Co.*, 198 F.3d at 104 (quoting *McMillan v. State Mut. Life Assurance Co.*, 922 F.2d 1073, 1075 (3d Cir. 1990)). Pennsylvania courts have applied this rule liberally. *Id.*

Amer. Auto. Ins. Co., 658 F.3d at 320-21.

Turning to the issue of whether Selective has a duty to defend Midwest in the Underlying Action, under Pennsylvania law, "the obligation of a casualty insurance company to defend an action brought against the insured is to be determined solely by the allegations of the complaint in the action.'" Holy Ghost Carpatho-Russian Greek Catholic (Orthodox) Church of the Eastern Rite of Phoenixville, Pa. v. Church Mut. Ins. Co., 492 F. App'x 247, 249 (3d Cir. 2012) (quoting Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co., 908 A.2d 888, 896 (Pa. 2006)). As further explained by the United States Court of Appeals for the Third Circuit in Ramara, Inc. v. Westfield Ins. Co., 814 F.3d 660 (3d Cir. 2016):

Importantly, Pennsylvania adheres to the "four corners" rule (also known as the "eight corners" rule), under which an insurer's potential duty to defend is "determined solely by the allegations of the complaint in the [underlying] action." *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 589 Pa. 317, 908 A.2d 888, 896 (2006) ("*Kvaerner*") (emphasis in original) (citation omitted). Under the four corners rule, a court in determining if there is coverage does not look outside the allegations of the underlying complaint or consider extrinsic evidence. *Id.*

Ramara, 814 F.3d at 673. In a footnote, the Ramara court continued its explanation: "[t]here will be eight corners because a court in deciding if there is coverage will look at both the insurance policy and the underlying complaint." Id. at n.9. Moreover, "'[g]enerally speaking, under

15

Pennsylvania law, the issuer of a general liability insurance policy has a duty to defend its insured when the allegations in the complaint against it could potentially fall within the coverage of the policy.' An insurer must defend if any claim included in the complaint may potentially fall under the policy and must continue to defend until it can confine the complaint to a claim that has no possibility of falling under the policy." Sunoco, Inc. v. Ill. Nat'l Ins. Co., 226 F. App'x 104, 108-09 (3d Cir. 2007) (citations omitted). Finally, in reviewing the allegations contained in the underlying complaint, the allegations must be viewed as true, and be liberally construed in the insured's favor. Am. and Foreign Ins. Co. v. Jerry's Sport Center, Inc., 2 A.3d 526, 541 (Pa. 2010) (citing Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co., 193 F.3d 742 (3d Cir. 1999)).

## IV. LEGAL ANALYSIS

### A. Whether Selective owes Midwest a Duty to Defend under the Terms of the Selective Policy.

#### 1. Whether Midwest is an "insured" under the terms of the Selective Policy.

As previously stated, in support of its motion for summary judgment, Plaintiffs contend that Selective owes Midwest a duty to defend under the Selective Policy because Midwest is an "insured" under the terms of the policy. See ECF No. 36 at 11-12. In support thereof, Plaintiffs cite to the definition of "insured" contained in the Truckers Endorsement provision of the Selective Policy. As also stated, conversely, Selective argues that Plaintiffs' motion for summary judgment must be denied and its motion for summary judgment must be granted because Midwest is not an "insured" to whom, under the terms of the Selective Policy, it owes a duty to defend. See ECF No. 39 at 1.

#### a. **Eight corners analysis**

The Court turns first to the four corners of the Selective Policy. The parties agree that section (B)(2)(c) of the Truckers Endorsement provision of the Selective Policy contains the determinative definition of "insured" for the purpose of deciding whether or Midwest qualifies as an "insured" under the terms of the Selective Policy. ECF No. 36 at 11; ECF No. 39 at 8. This provision states in relevant part:

> For any operations you engage in as a "trucker" the policy is changed as follows:
>
> **A. Who Is An Insured** under Liability Coverage is replaced by the following:
>
> 1. **Who Is An Insured**
>
> . . .
>
> (c) **The owner or anyone else from whom you hire or borrow a covered "auto" that is a "trailer" while the "trailer" is [connected] to another covered "auto" that is a power unit**, or, if not connected:
>
>> (1) Is being used exclusively in your business as a "trucker"; and
>> (2) Is being used pursuant to operating rights granted to you by a public authority.

ECF No. 34, ¶ 47 (emphasis added). More particularly, the parties agree that within this definition of "insured," the critical terms are "borrow" and "hire" and the critical inquiry is whether Midwest is an "insured" under the Selective Policy because Veltri Trucking "borrow[ed]" or "hire[d]" the Midwest Trailer from Midwest. ECF No. 36 at 11; ECF No. 39 at 9.

Delving into the meaning of "hire or borrow" in the Selective Policy, neither "hire" nor "borrow" are defined in the policy. Therefore, as discussed *supra*, pursuant to Pennsylvania law, the Court must give the terms their plain, natural, ordinary meaning and can look to dictionary

17

definitions for guidance. Am. Auto. Ins. Co., 658 F.3d at 320; Melrose Hotel Co., 423 F. Supp. 2d at 495 (citation omitted). The definition of "hire" in the Merriam – Webster dictionary is "a payment for the temporary use of something." http://unabridged.merriam-webster.com/unabridged/hire. The definition of "borrow" in the Merriam – Webster dictionary is "to receive temporarily from another, implying or expressing the intention either of returning the thing received or of giving its equivalent to the lender: obtain the temporary use of." http://unabridged.merriam-webster.com/unabridged/borrow. Similarly, Black's Law Dictionary provides the following definition: "[t]o take something for temporary use." Black's Law Dictionary (10th ed. 2014). See also Schroeder v. Bd. of Sup'rs of Louisiana State Univ., 591 So. 2d 342, 343 (La. 1991) (interpreting the term "borrow" in a standardized national commercial automobile liability policy, the state supreme court concluded that the word was clear and explicit and that "[u]nder its generally prevailing meaning, *borrow* connotes the acquisition of temporary possession, dominion or control of a thing, or the right to direct the use of a thing, not merely the receipt of some benefit from its use by another person"). Further, as explained in Castlepoint Nat. Ins. Co., *supra.*, where the court interpreted the meaning of the same definition of "insured" at issue in this litigation (i.e. the definition of "insured" set forth in the Truckers Endorsement), "[i]n its ordinary meaning, 'from whom you borrow' requires a *proximate source* interpretation. In other words, 'from whom you hire or borrow a covered "auto'" . . . is plainly understood to mean the specific party from whom the insured directly acquired the vehicle." Id. at *7 (footnote omitted) (emphasis added).

## b. Amended Complaint in the Underlying Action[1]

The Court turns next to the four corners of the Amended Complaint in the Underlying Action to examine whether it is possible under the factual allegations in the pleading, liberally construed, that Veltri Trucking "hire[d] or borrow[ed]" the Midwest Trailer from Midwest. Under Pennsylvania law, "an insurer has a duty to defend if there is any possibility that its coverage has been triggered by allegations in the underlying complaint." Ramara, Inc., 814 F.3d at 674. Reviewing the relevant allegations contained in the Amended Complaint in the Underlying Action, the plaintiffs claimed that the Midwest Trailer that was owned or controlled by Midwest had been placed out of service and left by Midwest at the Cargo Force facility, and Veltri Trucking, through its employee Sell, at the direction of Cargo Force, had coupled the Midwest Trailer with the Veltri Tractor and was operating the tractor-trailer unit at the time of the accident that killed Mr. Rice and injured Mrs. Rice. See Amended Complaint: ECF 1-1, ¶¶ 14, 20, 23, 24, and 32. The Court concludes that based upon these factual allegations, liberally construed, it is possible that on September 8, 2014, Veltri Trucking "borrow[ed]" the Midwest Trailer from Midwest in that based upon these allegations one could conclude that on that date, Veltri Trucking had taken temporary possession and use of the Midwest Trailer from Midwest for its own purposes through some express or implied permissive arrangement with Midwest.

---

[1]Plaintiffs contend that in determining whether Veltri Trucking "hire[d] or borrow[ed]" the Trailer from Midwest, the Court can look outside of the eight corners and review the parties' contracts with the United States Postal Services as well as declarations by Midwest's general counsel and James Veltri, the owner of Veltri Trucking. The United States Court of Appeals for the Third Circuit has recognized as least one scenario when facts outside of the four corners of the underlying complaint are properly taken into consideration by the court in determining whether an insurer has a duty to defend an insured in an underlying action, when the Pennsylvania Workers' Compensation Act is applicable to the underlying action. See Ramara, Inc. v. Westfield Ins. Co., 814 F.3d 660, 680 (3d Cir. 2016) ("The District Court simply reaffirmed what should be obvious: an insurer cannot bury its head in the sand and disclaim any knowledge of coverage-triggering facts. *See, e.g.*, Revelation Indus., Inc. v. St. Paul Fire & Mar. Ins. Co., 350 Mont. 184, 206 P.3d 919, 928 (2009) ('An insurer cannot ignore knowledge of facts that may give rise to coverage under the policy simply because the complaint—which is, after all, drafted by a claimant over whose draftsmanship the insured has no control—does not allege these facts of which the insurer has knowledge')". It is unnecessary for the Court to decide whether or not to review the outside documentation in this matter because for the reasons set forth *infra*, a review of the allegations in the Amended Complaint in the Underlying Action leads to the conclusion that it is possible that Veltri Trucking "borrow[ed]" the Midwest Trailer from Midwest.

The Court further finds that because it is possible under the allegations contained in the Amended Complaint in the Underlying Action, that Veltri Trucking "borrow[ed]" the Midwest Trailer from Midwest, and it is not disputed that Midwest Trailer was connected to the Veltri Tractor at the time the dually wheels allegedly detached from the Midwest Trailer and caused bodily injury to the Rices, under the terms of the Truckers Endorsement provision of the Policy, Midwest was an "insured" under the Truckers Endorsement provision of the Selective Policy at the time of the accident that forms the core of the Underlying Action. In so holding, the Court expressly disagrees with Selective's contention that because the allegations surrounding Midwest's legal obligation to pay damages are based upon a time when the Midwest Trailer was not attached to the Veltri Tractor, Midwest cannot be an "insured" under the Selective Policy. See ECF No. 46 at 14 ("[r]eading the policy as a whole leads to the inescapable conclusion that Midwest is only an insured where the injuries claimed result from the ownership, maintenance or use of the Trailer while it was connected to the Veltri Tractor"). The determination of whether Midwest was an "insured" under the Selective Policy is based solely upon the definition of "insured" contained in the Truckers Endorsement of the Selective Policy, and that definition does not contain any such limitation.

## 2. Whether any of the claims against Midwest set forth in the Underlying Action are covered by the Selective Policy.

Having concluded that Midwest was an "insured" under the Selective Policy at the time of the accident at issue in the Underlying Action, the Court's next determination is whether any of the claims brought by the Rices in the Amended Complaint in the Underlying Action as against Midwest fall within the liability coverage provision of the Selective Policy which provides, "[w]e will pay all sums an 'insured' [i.e. Midwest] legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an

'accident' and resulting from the ownership, maintenance or use of a covered 'auto'." If they do, then Selective has a duty to defend Midwest as to these claims in that under the Business Owners Auto Form of the Selective Policy, Selective has a duty to defend "any 'insured' against a 'suit' asking for . . . damages [because of 'bodily injury' or 'property damage' to which this Insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto']." ECF 1-3 at 42.

Selective argues that even if Midwest is an "insured" under the Selective Policy, summary judgment still must be granted in its favor and Plaintiffs' motion for summary judgment must be denied because the claims for which Midwest seeks coverage are not covered under the Selective Policy and, therefore, there is no duty to defend Midwest relative to the Rices' claims against it. ECF No. 39 at 1. More specifically, Selective contends that Selective only has the duty to defend Midwest under the Selective Policy to the extent that the claims against Midwest in the Underlying Action are based on conduct undertaken by Midwest while the Midwest Trailer was attached to the Veltri Tractor. Indeed, Selective argues that:

[t]he Underlying Complaint makes clear that the claims against Midwest all result from Midwest's failure to properly maintain the Trailer and its failure to properly alert Sell to the Trailer's condition. Each of these alleged acts occurred well before the Trailer was connected to the Tractor. As against Midwest therefore, the Underlying Complaint alleges liability for injury that resulted from maintenance that was improperly performed while the Trailer was not connected to the Tractor.

ECF No. 39 at 18.

In response to Selective's motion for summary judgment, and in support of their motion for summary judgment, Plaintiffs contend that the Selective Policy covers Midwest because the accident and injuries resulted from Sell's use of the Midwest Trailer. See ECF No. 36 at 19 ("In coupling the Trailer to the Tractor, failing to observe that the Trailer was not fit for his use, and

21

taking the Tractor-Trailer combination on the highway, Sell most definitely used the Trailer -- a covered "auto" -- and the underlying plaintiffs' damages resulted from his use"); ECF No. 43 at 4 ("Under *Agway [Ins. Co. v. Goodville Mut. Cas.*, 48 F. App'x. 37 (3d Cir. 2002),] one allegation that the underlying plaintiffs' bodily injuries resulted from the detachment of the rear dually-tires from the Trailer while the Tractor-Trailer unit was actively being operated by Reggie Sell, Jr. ("Sell"), while in the course and scope of his employment with Veltri Trucking, is all that is needed to establish that the alleged injuries resulted from the 'use' of the Trailer. . . . [T]here are **over fifteen** such allegations in the Underlying Action Complaint that trigger Selective's defense obligations") (emphasis in original); ECF No. 50 at 7 (the fifteen plus allegations in the Complaint that pinpoint the detachment of the rear dually-tires from the Trailer while the Tractor-Trailer unit was actively being operated by Sell in the course and scope of his employment with Veltri Trucking, as a direct cause of the underlying plaintiff's injuries "prove that the underlying plaintiffs' claims for 'damages because of "bodily injury"' were caused by an "accident" resulting from the use of a covered "auto"").

Although not binding on this Court, the United States District Court for the Middle District of Florida's decisions in Keymark Corp. of Fla., Inc. v. Empire Fire and Marine Ins. Co., No. 6:7-963, 2008 WL 11336588 (M.D. Fla. July 28, 2008) ("Keymark I") and Keymark Corp. of Fla., Inc. v. Empire Fire and Marine Ins. Co., No. 6:7-963, 2008 WL 11336589 (M.D. Fla. Aug. 22, 2008) ("Keymark II") are instructive. In Keymark I, the driver of a tractor-trailer unit, Stanley Stader ("Mr. Stader") had been killed in an accident while unloading a trailer. Keymark I, 2008 WL 11336588, at *1. Mr. Stader had contracted with Phillip Williams Sons, Inc. ("Phillip Williams") to transport aluminum extension from a facility owned by the plaintiff Keymark Corporation of Florida, Inc. ("Keymark") to the facility of a Keymark customer,

22

Windsor, Inc. ("Windsor"). Id. Keymark employees had loaded the extensions onto a trailer that Keymark had leased. Id. Mr. Stader then drove a tractor owned by Phillip Williams to pick up the trailer at Keymark's facility. Id. The tractor was connected to the loaded trailer at Keymark's facility. Mr. Stader subsequently arrived at the Windsor facility and, as he was in the process of removing the straps that secured the load, the extensions fell from the trailer, landed on Mr. Stader, and he was killed. Id.

On the date of the accident, Keymark had a liability insurance policy with American Fire & Casualty Company and Phillip Williams had a liability insurance policy with the defendant Empire Fire and Marine Insurance Company ("Empire"). Id. As a result of the accident, the personal representative of Mr. Stader's estate instituted an action in state court for wrongful death ("the underlying action"). Id. It alleged that Keymark was negligent in its loading of the trailer. Id. Keymark initiated the federal court lawsuit, seeking a declaratory judgment that Empire had a duty to defend and indemnify Keymark for the damages in the underlying action. Id.

The Empire insurance policy ("the Empire policy") provided that Empire will "pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from ownership, maintenance or use of a covered 'auto.'" Id. (citation omitted). Under the relevant provision, an insured was defined as "[t]he owner or anyone else from whom you hire or borrow a covered 'auto' that is a 'trailer' while the 'trailer' is connected to another covered 'auto' that is a power unit . . . ." Id. (citation omitted). A covered auto included "any 'trailers' you don't own while attached to any power unit described in Item 3." Id. (citation omitted). There was no dispute

23

that the tractor was specifically identified as a covered auto under Item Three of the Empire

policy. Id.

In Keymark, the parties filed cross motions for summary judgment. The court

summarized the parties' supporting arguments, which bear a striking resemblance to the

arguments filed by Plaintiffs and Defendant in the case *sub judice*:

Keymark contends that it is an insured under the Empire policy because the trailer
was attached to the tractor at the time of the accident. Keymark relies on the plain
language of the Empire policy to assert that since Phillip Williams had borrowed
the trailer which was connected to the tractor at the time of the accident, Keymark
is an insured and the trailer is a covered auto. Empire relies on the allegations
contained in the underlying action to assert that "Keymark's legal obligation to
pay damages occurred at the time of loading when the '[t]railer was not attached
to the tractor," and therefore, "Keymark was not an insured since the [t]railer was
not a covered auto." Empire also argues that Keymark is not an insured under the
policy because Philip Williams neither hired or borrowed the trailer from
Keymark.

Id. (citations omitted).

The district court held that Keymark was an insured under the Empire policy, the trailer

was a covered auto under the Empire policy at the time of the accident and, therefore, Empire

had a duty to defend and indemnify Keymark for the damages alleged in the underlying action as

to the claim that Keymark was negligent in its loading of the trailer. Id. at 3. In so holding, the

court reasoned:

There is no dispute that the tractor was specifically identified as a covered auto
under Item Three of the Declarations to the Empire policy at the time of the
accident. Empire concedes that under its policy, a trailer that is not owned by
Phillip Williams is a covered auto only if it is connected to a covered tractor.
There is also no dispute that at the time of the accident, the trailer was connected
to the tractor. The Court finds that the claims contained in the underlying action
regarding the allegedly negligent loading of the trailer by Keymark do not
determine whether Keymark was an "insured" and whether the trailer was a
covered auto under the Empire policy. Rather, since there is no dispute that the
trailer was connected to the covered tractor at the time of the accident which is the
subject of the underlying action, the Court finds that the trailer is a covered auto
and that Keymark is an insured under the policy. Furthermore, while Phillip

24

Williams did not "hire" the trailer, Phillip Williams did "borrow" the trailer from Keymark under that term's plain and ordinary meaning because Phillip Williams was to return the trailer to Keymark.

Id. (citations omitted). The court then granted Keymark's motion for summary judgment on its declaratory judgment claim and denied Empire's motion for summary judgment. Id.

Thereafter, Empire filed a motion for reconsideration, arguing that Keymark was not entitled to coverage under the Empire insurance policy because the allegations of the underlying action involved the loading of the trailer before it was connected to the tractor. Keymark II, 2008 WL 11336589, at *1. The Keymark II court observed that Empire had "merely rehashed" arguments it had previously raised in support of its motion for summary judgment and in opposition to Keymark's motion for summary judgment when it argued that Keymark "is not entitled to coverage under the Empire insurance policy because the allegations of the underlying action involve the loading of the trailer before it was connected to the tractor." Id. The court expressly disagreed with this argument, found no clear error or manifest injustice in its conclusion that Keymark was entitled to summary judgment, and denied Empire's motion for reconsideration.

As did the court in Keymark I and Keymark II, this Court concludes that the plaintiffs' claims in the Underlying Action against Midwest, to the extent that they are based upon bodily injuries suffered by Mr. and Mrs. Rice while the Midwest Trailer was attached to the Veltri Tractor, being caused by Midwest's negligent or intentional conduct with respect to the maintenance of the Midwest Trailer, see Amended Complaint: ECF 1-1, ¶¶ 120, 127, 132, are claims covered under the Policy's provision that "[w]e will pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a

25

covered 'auto.'" ECF No. 1-3 at 42. Accordingly, as to these claims, Selective owes Midwest a duty to defend.

Plaintiffs also contend that Selective's obligation to defend Midwest is triggered by the Selective Policy's Endorsement of Motor Carriers Policies of Insurance for Public Liability Under Sections 29 and 30 of the Motor Carrier Act of 1980 and Endorsement for Motor Carrier Policies of Insurance for Automobile Bodily Injury and Property Damage Liability under Section 10927, Title 49 of the United States Code, Form BMC 90 ("the Motor Carrier Endorsements"). ECF No. 36 at 13. In support of this position, Plaintiffs argue:

> Both of these endorsements provide coverage for any "final judgment recovered against the Insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980. *See* JSOUF at ¶¶ 51-53. This coverage applies "regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere." *See id.*

> As established above, the Underlying Action Complaint contains allegations against Midwest that arise from violations of the Federal Motor Carrier Safety Regulations ("FMCSR"). It avers that Midwest's conduct leading up to the accident was in violation of §396.3, §393.7(b), and §396.13 of the FMCSR. See JSOUF at ¶ 28. *See also* Ex. "B" to JSOUF at ¶ 24. It further alleges that Midwest violated numerous additional federal motor carrier safety regulations including 75 Pa.C.S. §46701; 75 Pa.C.S. §4702; 75 Pa.C.S. §7802 along with the following sections of the FMCSR: 392.2; 390.11; §390.13; 392.7; 396.3; 396.7; 396.9; 396.11; 396.13; 396.17; and 396.12. *See* Ex. "B" to JSOUP at ¶¶ 120, 127, 132.

ECF No. 36 at 14. Thus, Plaintiffs conclude the "[b]ecause it is undisputed that Midwest is an "insured" under the Selective Policy for the reasons set forth [*supra.*], the allegations against Midwest for violations of the Federal Motor Carrier regulations further trigger Selective's primary defense obligations." Id.

26

The Court disagrees. Upon review of the plain, unambiguous language of the Motor Carrier Endorsements, the endorsements clearly only apply to "the Insured," which is the named insured in the Selective Policy -- Veltri Trucking -- and do not apply to "an insured" covered under the Selective Policy pursuant to the Truckers Endorsement such as Midwest. As such, any claims against Midwest for violations of the Federal Motor Carrier regulations do not fall within the coverage of the Selective Policy based upon the Motor Carrier Endorsements.

### B. Whether Selective owes Midwest a Duty to Indemnify under the Terms of the Selective Policy.

Plaintiffs also seek summary judgment on their claim that Selective owes Midwest a duty to indemnify with respect to the Underlying Action under the terms of the Selective Policy. In general, "[a] court entertaining a declaratory judgment action in an insurance coverage case should refrain from determining the insurer's duty to indemnify until the insured is found liable for damages in the underlying action." Cincinnati Ins. Cos. v. Pestco, Inc., 374 F. Supp. 2d 451, 465 (W.D. Pa. 2004). This is because "[t]he question of whether [the insurer] has a duty to indemnify . . . is 'not ripe for adjudication until the insured is in fact held liable in the underlying suit.'" Metropolitan Prop. and Cas. Ins. Co. v. Spayd, No. 16-4693, 2017 WL 3141170, at *2 (E.D. Pa. July 24, 2017) (citing Knightbrook Ins. Co. v. DNA Ambulance, Inc., No. 13-2961, 2013 WL 6662745, at *7 (E.D. Pa. Dec. 16, 2013), which, in turn, cites Heffernan & Co. v. Hartford Ins. Co., 614 A.2d 295, 298 (Pa. Super. Ct. 1992)). See id. (citing C. H. Heist Caribe Corp. v. Am. Home Assurance Co., 640 F.2d 479, 483 (3d Cir. 1981) ("holding that because '[a]ctual indemnification depends upon the existence or nonexistence of facts not yet established ... a decision on [the insurance company's] obligation to indemnify [the insured] is premature' when no judgment has been issued").

27

Having concluded that Selective has a duty to defend Midwest in the Underlying Action, the Court further finds that, because the issue of Selective's duty to indemnify Midwest "depends upon the existence or non-existence of facts not yet established" in the Underlying Action, it is not ripe. C. H. Heist Caribe Corp., 640 F.2d at 483. Therefore, the issue of Selective's duty to indemnify Midwest shall be deferred until Midwest's liability in the Underlying Action is decided. Plaintiffs' motion for summary judgment on Count I of their Complaint, to the extent that it relates to Selective's duty to indemnify Midwest with respect to the Underlying Action, shall be denied without prejudice to file a renewed motion for summary judgment on the issue of indemnification upon resolution of the Underlying Action.

**C. Whether Selective Breached the Policy as to Midwest by failing to Defend Midwest under the Terms of the Selective Policy and Whether Selective owes Great West Casualty Equitable Contribution for the Defense Costs it has Incurred to Date in Defending Midwest in the Underlying Action.**

Plaintiffs have also moved for summary judgment on Count II (breach of contract) and Count III (equitable contribution) of their Complaint against Selective. In response to Plaintiffs' motion for summary judgment on the breach of contract and equitable contribution claims set forth in Counts II and III of the Complaint, Selective states:

> Plaintiffs contend that the Court should grant summary judgment as to Count II (Breach of Contract), Count III (Equitable Contribution). These arguments presume that Midwest is an insured under the Selective Policy for the claims asserted in the Underlying Action and that Selective has a duty to defend Midwest. As demonstrated above, Midwest is not an insured under the Selective Policy and therefore Selective has no duty to defend. Accordingly, Plaintiff's motion for summary judgment as to Counts II and Count III of Plaintiffs' complaint should be denied.

ECF No. 46 at 16-17. The Court reads this response by Selective to be an implied concession by Selective that, if Midwest is an insured under the Selective Policy for the claims asserted in the Underlying Action such that Selective has a duty to defend Midwest, then Plaintiffs are entitled

to summary judgment on their claims set forth in Counts II (breach of contract) and III (equitable contribution) of the Complaint. Having concluded that Midwest is an insured under the Selective Policy and Selective has a duty to defend Midwest with respect to the Underlying Action, a duty which Selective has not fulfilled to date, the Court will grant Plaintiffs' motion for summary judgment as to Count II of the Complaint, the breach of contract claim, and as to Count III of the Complaint, the equitable contribution claim.

## V. CONCLUSION

For the reasons set forth above, Plaintiff's motion for summary judgment, ECF No. 33, shall be granted in part and denied in part without prejudice and the case will be stayed. Plaintiffs' motion for summary judgment as to Count I of their Complaint for Declaratory Judgment shall be granted to the extent that Plaintiffs seek a declaration that Selective owes Midwest a duty to defend, and shall be denied without prejudice to the extent that Plaintiffs seek a declaration that Selective owes Midwest a duty to indemnify. In addition, Plaintiffs' motion for summary judgment as to Counts II and III of their Complaint for Breach of Contract and Equitable Contribution shall be granted and Defendant's motion for summary judgment, ECF No. 37, shall be denied.

An appropriate Order follows.

DATED: September 28, 2017

BY THE COURT:

MAUREEN P. KELLY
CHIEF UNITED STATES MAGISTRATE JUDGE

cc: All counsel of record via CM/ECF

29